UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BEIJING AUTOMOTIVE INDUSTRY IMPORT AND EXPORT CORPORATION, | ) ) | |
|     *Plaintiff/Counter-Defendant*, | ) ) | 1:13-cv-01850-JMS-DML |
|     *vs.* | ) ) | |
| INDIAN INDUSTRIES, INC. d/b/a ESCALADE SPORTS, | ) ) ) | |
|     *Defendant/Counter-Plaintiff*. | ) | |

## <u>ORDER</u>

Plaintiff Beijing Automotive Industry Import and Export Corporation ("BAIEC") initiated this lawsuit against Defendant Indian Industries, Inc. d/b/a Escalade Sports ("Escalade") after a ten-year business relationship between the two entities deteriorated. Presently pending before the Court is BAIEC's Motion for Summary Judgment. [Filing No. 68.]

### I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure

to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to

the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The Court notes at the outset that Escalade has not complied with Local Rule 56-1(b), which provides that a response to a motion for summary judgment "must include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." While Escalade includes a section titled "Statement of Material Facts in Dispute" in its response brief, [Filing No. 86 at 16-17], that section simply lists eight issues that Escalade claims are in dispute. [*See, e.g.*, Filing No. 86 at 17 ("Whether Escalade's requests to BAIEC for assurances over the course of January 2013 were 'adequate' based on the factual conditions").] Escalade does not identify specific facts set forth by BAIEC that it contends are in dispute, as required by Local Rule 56-1(b). Instead, it provides its own version of events in a section titled "Background Facts." [Filing No. 86 at 2-16.] Escalade's approach does not comply with Local Rule 56-1(b), and has made review of the motion unnecessarily cumbersome. Escalade should ensure that it complies with this rule in the future.

The Court has attempted to sift through Escalade's version of events, determine which facts set forth by BAIEC it disputes, and construe disputed facts in Escalade's favor when Escalade has provided citations to evidence in the record. But failure to comply with Local Rule 56-1(b) can result in a concession of the movant's version of events. *See, e.g.*, *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (the Seventh Circuit has "repeatedly upheld the strict enforcement of these rules, sustaining the entry of summary judgment when the non-movant has

failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts").

The Court finds the following to be the undisputed facts, supported by proper citation to admissible evidence in the record:

**A.  BAIEC and Escalade Begin Their Business Relationship**

BAIEC is a Chinese company engaged in the business of supplying sports and other equipment to customers in the United States.  [Filing No. 72-1 at 1-2.]  Escalade is an American company that sells sports and other equipment in the United States.  [Filing No. 72-1 at 2.]  Escalade originally manufactured its basketball products domestically, but in 2005 it realized that in order to remain competitive, it would need to shift its basketball manufacturing operations to China.  [Filing No. 86-1 at 3.]  As part of that shift, Escalade sought the assistance of a Chinese entity to "facilitate the development and operation of its Chinese supply chain to manufacture in-ground basketball systems."  [Filing No. 86-1 at 3.]  Escalade had previously worked with Jian Qian Wang, also known as John Wei, to source Chinese parts for its table tennis and billiards products.  [Filing No. 86-1 at 3.]  Mr. Wei owns a company in Hong Kong called Expert Base Limited ("Expert Base"), and Expert Base works as a sales representative for BAIEC.  [Filing No. 72-2 at 3.]  Mr. Wei is also an Assistant General Manager of BAIEC.  [Filing No. 72-2 at 3.]

Escalade retained BAIEC to assist it in "developing and operating a supply chain to manufacture in-ground basketball systems and export those systems to the United States for sale to Escalade's retail customers."  [Filing No. 86-1 at 3.]  Escalade "relied on BAIEC to ensure [its] Chinese supply chain ran smoothly, to facilitate communications between the various links in the chain, and to handle problems as they arose."  [Filing No. 86-1 at 3.]

Mr. Wei and Expert Base worked on the Escalade account. [Filing No. 72-2 at 3.] Specifically, Mr. Wei was responsible for negotiating and fulfilling purchase order contracts ("POCs") whereby Escalade would purchase sporting goods equipment manufactured in China from BAIEC, including basketball equipment, tennis kits, and pool tables. [Filing No. 72-2 at 3.] Included in that equipment were Goalrilla, Silverback, and Goliath basketball systems and accessories, and these products are the subject of this lawsuit. [Filing No. 72-2 at 3-4.] Mr. Wei was also involved with developing new products, developing the procedure for producing the products, and quality control of the products. [Filing No. 72-2 at 3.] Over the course of the relationship between the two entities, Escalade dealt almost exclusively with Mr. Wei. [Filing No. 86-1 at 3.]

The usual course of business between the entities involved Escalade sending purchase orders electronically to BAIEC which described the equipment to be purchased and the price and arrival date. [Filing No. 72-2 at 4.] The purchase orders stated that they were subject to the terms of a Vendor Partnership Guide. [*See, e.g.*, Filing No. 72-4 at 2.] BAIEC would accept the purchase orders by signing them and returning them to Escalade within a day or two. [Filing No. 72-2 at 4.] The purchase orders then became POCs and were marked "FIRM ORDER." [Filing No. 72-2 at 4.] BAIEC and Escalade did not have a written contract that specified the terms of their agreement – the POCs were the only written contracts. [Filing No. 72-2 at 4.] The POCs contained the following language: "This is a FIRM ORDER. Please sign, date, and fax this back to [Escalade] acknowledging your acceptance of the terms, quantity, price, ship date, and additional terms/conditions outlined in Escalade's Vendor Partnership Guide." [*See, e.g.*, Filing No. 72-4 at 2.] The Vendor Partnership Guide provides, in relevant part:

> **DELIVERY/CANCELLATION:**…If deliveries of materials or services are not made as specified, or if all specifications are not fulfilled, or if our requirements change, we reserve the right, without liability and in addition to any other rights and remedies, to cancel any part or all of our purchase orders by notice to you as to

> items not shipped and to purchase substitute items elsewhere, in which event you shall reimburse us for all additional costs and expenses incurred within seven (7) days of our notice to you of such additional costs and expenses.

[Filing No. 72-5 at 8.] Escalade believes it provided BAIEC with a copy of the Vendor Partnership Guide in the course of their relationship, [Filing No. 94-2 at 26], but BAIEC denies having received that document prior to discovery in this case, [Filing No. 72-2 at 4].

BAIEC retained several factories (the "Component Factories") to manufacture certain components of the basketball systems is purchased, such as the glass backboards, nets, pole padding, and actuator (which raises and lowers basketball goals with adjustable height settings). [Filing No. 86-1 at 4.] Those component parts were paid for with BAIEC's money, then shipped to Tangshan Lai Yuan Metal Products Co., Ltd. ("Lai Yuan"), a factory responsible for manufacturing the steel components of the basketball system, assembling all of the components into the finished basketball system, and transporting the systems to port for shipment to Escalade in the United States. [Filing No. 72-2 at 5; Filing No. 86-1 at 4.] BAIEC worked with Lai Yuan to assure its production process met Escalade's engineering specifications. [Filing No. 72-2 at 4.] BAIEC did not have a written agreement with Lai Yuan, however. [Filing No. 72-2 at 4.] Lai Yuan was the key supplier in Escalade's basketball supply chain, and BAIEC acknowledges this because BAIEC had trained its employees and had "established some kind of a trust or system." [Filing No. 94-3 at 22-23.]

From the time Escalade placed a purchase order with BAIEC and the order was accepted, it generally took 90-120 days for the basketball systems in that purchase order to be manufactured, assembled, and then delivered to the United States. [Filing No. 86-1 at 4.] Based on their usual course of business, Escalade would wire payment to BAIEC within approximately seven days after shipment of the goods from port. [Filing No. 72-2 at 5.] Lai Yuan would send BAIEC invoices

within a day or two of shipment of the goods, and BAIEC would pay Lai Yuan within sixty days of shipment (which later changed to thirty days). [Filing No. 72-2 at 5.] BAIEC was required to pay the Component Factories within sixty days after the Component Factories shipped the component parts to Lai Yuan (or often within thirty days) pursuant to a long-standing oral agreement between them. [Filing No. 72-2 at 6.] BAIEC routinely paid Lai Yuan and the Component Factories on time. [Filing No. 72-2 at 6.]

When BAIEC first began using Lai Yuan to manufacture the equipment for Escalade's POCs, Escalade was ordering, on average, approximately $5.5 million in products annually from BAIEC. [Filing No. 86-1 at 5.] By 2012, Escalade's orders had grown to over $10 million annually. [Filing No. 86-1 at 5.]

### B. The Relationship Between BAIEC and Escalade Begins to Deteriorate

Lai Yuan and BAIEC had worked together without a written contract for many years, but in 2010 Lai Yuan requested that the parties enter into a written contract. [Filing No. 94-5 at 9-11.] Lai Yuan's payment from BAIEC was "very undefined" without a written contract, and as Lai Yuan began producing a larger quantity of products, it wanted a written agreement that governed payment to protect itself. [Filing No. 94-5 at 11-12.] Further exacerbating Lai Yuan's concerns, Lai Yuan had been under the impression that Escalade was paying it directly, but learned in 2010 that it was actually being paid from a Hong Kong bank account controlled by Mr. Wei. [Filing No. 94-5 at 12-13.] Additionally, Lai Yuan had been under the impression that Escalade would not pay for replacement parts, but had found out by 2012 that Escalade was paying BAIEC for 90% or more of the replacement parts Lai Yuan provided, but BAIEC was not passing that payment on to Lai Yuan. [Filing No. 94-5 at 32.] Finally, BAIEC had threatened Lai Yuan in 2012 to move the steel manufacturing and assembling business to another factory, although BAIEC did not have

another factory ready to take over production at that point. [Filing No. 94-3 at 51-54.] Despite Lai Yuan's concerns, in 2012 Mr. Wei informed Qing Zhong Yu, the co-owner and General Manager of Lai Yuan, that a written agreement would not be forthcoming. [Filing No. 86-7 at 1; Filing No. 94-5 at 16-17.]

In September 2012, Safari Chung, head of Escalade's Shanghai, China office and Escalade's Chinese supply chain, received a visit from Mr. Yu. [Filing No. 86-7 at 2.] Mr. Yu informed Mr. Chung that Lai Yuan was dissatisfied with the existing relationship between Lai Yuan and BAIEC/Mr. Wei. [Filing No. 86-7 at 2.] Specifically, Mr. Yu complained that:

· Lai Yuan did not have a written agreement with any entity relating to its production of basketball systems that were ultimately sold to Escalade;

· Lai Yuan's relationship was not with BAIEC, but was with Mr. Wei and Expert Base;

· Due to the lack of a formal agreement, Lai Yuan had no formal payment schedule or legal documents on which to rely if BAIEC/Mr. Wei failed to pay Lai Yuan for goods produced for Escalade; and

· Mr. Wei had lied to Lai Yuan when he said it was being paid directly by Escalade when, in fact, Mr. Wei received payment from Escalade and then paid Lai Yuan out of the proceeds from Expert Base's bank account.

[Filing No. 86-7 at 2-3.] Mr. Yu also told Mr. Chung that Lai Yuan had expressed these concerns to Mr. Wei numerous times over the years, but that Mr. Wei would not address them, and that Lai Yuan would not continue to do business under the existing arrangement. [Filing No. 86-7 at 3.] Because Escalade's annual orders had grown to over $10 million by 2012, Mr. Yu was particularly concerned that Lai Yuan would not have any recourse if it was not paid. [Filing No. 86-1 at 5; Filing No. 94-5 at 17-18.]

Mr. Chung contacted James Allshouse, Vice President of Operations in Product Development for Escalade. [Filing No. 86-1 at 2; Filing No. 86-1 at 5.] Mr. Chung passed on Mr. Yu's

concerns to Mr. Allshouse, including that Lai Yuan would not continue doing business under the existing arrangement. [Filing No. 86-1 at 5.] This was the first time that either Mr. Chung or Mr. Allshouse were aware of any issues between Lai Yuan and BAIEC/Mr. Wei. [Filing No. 86-1 at 5; Filing No. 86-7 at 3.] Mr. Allshouse took Lai Yuan's complaints and statement that it would not continue to do business under the current arrangement very seriously. [Filing No. 86-1 at 6.] This was because Lai Yuan was the final link in Escalade's supply chain, and because Mr. Allshouse believed it would take six months to a year to find an adequate replacement for Lai Yuan in the supply chain. [Filing No. 86-1 at 6.] Mr. Allshouse asked Mr. Chung to set up a meeting with Lai Yuan's owners to discuss the situation. [Filing No. 86-7 at 3.]

Escalade did not know whether Lai Yuan's complaints were valid, but was concerned. [Filing No. 86-1 at 8.] Immediately after his initial meeting with Mr. Yu, Mr. Chung began communicating with Mr. Yu regarding obtaining pricing quotes for certain products, including table tennis and basketball systems, if Lai Yuan were to provide them directly to Escalade without BAIEC's involvement. [*See* Filing No. 72-11 (September 19, 2012 email from Mr. Chung to Mr. Yu requesting price quotes).] These communications regarding price quotes continued for several months. [*See* Filing No. 72-12 (November 2 and November 3, 2012 email chain between David Fetherman (President of Escalade's Sports Division), Mr. Allshouse, and Mr. Chung regarding price quotes from Mr. Yu).] In the meantime, Escalade continued to enter into POCs with BAIEC and to pay BAIEC for the products that it delivered. [Filing No. 86-1 at 7.]

### C.  December 3, 2012 Meeting Between Escalade and Lai Yuan

On December 3, 2012, Mr. Allshouse, Mr. Chung, and Mr. Yu met in China to address Lai Yuan's concerns with BAIEC and Mr. Wei. [Filing No. 86-7 at 3.] Mr. Yu reiterated the same

complaints he had raised with Mr. Chung at their earlier meeting, and again said that if the arrangement did not change, Lai Yuan would not continue doing business with BAIEC and Mr. Wei. [Filing No. 86-7 at 3.]

For the remainder of December 2012, Mr. Allshouse researched whether Escalade could work directly with Lai Yuan. [Filing No. 86-1 at 7.] He was concerned about BAIEC's reaction when it learned of Lai Yuan's complaints, and "wanted to be prepared for the worst case scenario." [Filing No. 86-1 at 7.] Mr. Allshouse explored shifting future purchase orders directly to Lai Yuan, but keeping BAIEC involved to supervise quality control and expedite shipping. [Filing No. 86-1 at 7.] Mr. Allshouse also requested that Lai Yuan provide Escalade with price quotations for the basketball products it was to produce, and "discussed how a direct relationship between Escalade and Lai Yuan would function if Escalade chose to no longer do business with BAIEC and Mr. Wei." [Filing No. 86-1 at 7.] A December 5, 2012 email from Mr. Allshouse to Mr. Fetherman indicates that the two were speculating regarding BAIEC's profit margin and what was "an acceptable fee to manage the business." [Filing No. 70-1 at 2.]

Mr. Chung was also concerned that BAIEC would disrupt Escalade's supply chain, and recommended to Mr. Allshouse on several occasions that Escalade sever ties with BAIEC and Mr. Wei because he "did not trust them," and "believed [they] would retaliate against Lai Yuan and/or Escalade if they believed they were going to lose Escalade's future business." [Filing No. 86-7 at 4.] Mr. Chung sent Ms. Allshouse a December 13, 2012 email which contained the subject line "Lai Yuan versus BAEIC" and attached a document with the same title. [Filing No. 70-2 at 2.] The printed email contains a handwritten note that says "First Direct Comparison of Prices." [Filing No. 70-2 at 2.]

On December 14, 2012, Evan Lederman, Category Manager-Sports for Escalade, emailed Mr. Wei and stated, "As one of our biggest vendors, [Mr. Fetherman and Mr. Allshouse] would like to sit down with you in Evansville to discuss the state of both of our businesses. No hidden agenda at all. They are meeting with all of our vendors. Please give me some dates that you could come in for a day." [Filing No. 70-7 at 4.] They eventually set the meeting up for January 4, 2013 in Evansville. [Filing No. 70-7 at 2-3.]

On December 15, 2012, Mr. Allshouse emailed Mr. Chung to advise him that a meeting with Mr. Wei was being scheduled, and to request that Mr. Chung ask Mr. Yu about Lai Yuan's accounts receivables from BAIEC and the prices BAIEC pays the factory for each item. [Filing No. 75-1 at 1-2.] Mr. Allshouse stated: "We need this information to understand the best timing to shut off [Mr. Wei]. (we believe it is now…). We also need it to protect the factory. We believe that worst case, we'll tell John that we'll pay for all POs that have shipped, but we are paying the factory direct and then paying you. The balance of the POs will be cancelled for BAIEC and reissued directly to the factory." [Filing No. 75-1 at 2.] Mr. Allshouse requested that the "banking information and all documents" be signed and ready by the January 4 meeting with Mr. Wei. [Filing No. 75-1 at 2.]

Mr. Chung responded to Mr. Allshouse on December 17, 2012, stating "[n]eed to discuss the details about how…we want to proceed with the termination and Lai Yuan still can [be] producing for us without any delay on the raw material." [Filing No. 75-1 at 1.] He attached a list of accounts receivable, which showed that BAIEC had made all payments for products that had

shipped through December,[1] indicating BAIEC was not behind on payments to Lai Yuan at that time. [Filing No. 75-1 at 1; Filing No. 75-1 at 5-14.]

On December 18, 2012, Escalade and Lai Yuan entered into a Frame Agreement of Purchase, which is signed by Lai Yuan's General Manager and has Mr. Chung's name typed on behalf of Escalade but is not signed by Mr. Chung. [Filing No. 74-1.] Escalade was concerned that BAIEC would react negatively when it heard about Lai Yuan's complaints, and that BAIEC would attempt to shut off Escalade's Chinese supply chain. [Filing No. 86-1 at 8; Filing No. 86-8 at 3.]

Mr. Chung emailed Mr. Allshouse on December 23, 2012 to advise him that "Mr. Yu has a concern[] that [Mr. Wei] will [hold] the payment to his factory after the [January 4] meeting. This will turn out to [be] a big cash flow problem for them because no agreement between [Mr. Wei] and Lai Yuan." [Filing No. 70-5 at 2.] On January 3, 2013, Mr. Chung emailed Mr. Allshouse and stated "I talked with Mr. Yu just now and he also suggest[ed] to have [Mr. Wei] step out from the business and not interrupt the daily operation after the meeting. Like you said, all the production issue, deliver and suppliers will be communicate between Lai Yuan, Shanghai and EVV. Escalade can pay BAIEC 55% commission for 2013 to show the business relationship and no need [for Mr. Wei] to get involve[d] on anything. Mr. Yu will take care [of] the suppliers side, whatever the price that BAIEC pay to the suppliers, Mr. Yu will take care of it. This way is more safety for Escalade and [Mr. Wei] can't do anything on suppliers side." [Filing No. 70-6 at 2.]

---

[1] The spreadsheet BAIEC cites for this proposition appears to indicate that BAIEC had paid Lai Yuan for all but two shipments made during the 48th week of the year, but had not yet paid for shipments made during the 49th week or beyond. [Filing No. 75-1 at 5-14.] However, Escalade does not dispute BAIEC's statement that "BAIEC was not in arrears for any payments to Lai Yuan at that time," which is the relevant point for purposes of BAIEC's Motion for Summary Judgment.

### D.  The January 4, 2013 Meeting

Escalade scheduled a meeting with Mr. Wei at its Evansville, Indiana office to discuss Lai Yuan's complaints and the future relationship between Escalade and BAIEC.  [Filing No. 86-1 at 8.]  Escalade wanted to "explore options that would allow Lai Yuan, BAIEC, and Escalade to continue working together, and – most importantly – to ensure that Escalade's orders were going to be filled and shipped on time."  [Filing No. 86-1 at 8.]  Going into the meeting, Mr. Allshouse did not know whether Lai Yuan's complaints about BAIEC and Mr. Wei were valid, but his only concern was ensuring that Lai Yuan continue to produce products for Escalade because they were "the only factory capable of producing parts to fill Escalade's purchase orders for the [next] six months to one year…."  [Filing No. 86-1 at 8.]

Mr. Allshouse attested that at the beginning of the meeting, he and Mr. Fetherman told Mr. Wei about Lai Yuan's complaints regarding BAIEC, including that Lai Yuan did not have a written agreement, formal payment schedule, or legal document on which to rely in the event of non-payment, that Lai Yuan's relationship was not with BAIEC but rather with Mr. Wei and Expert Base, and that Lai Yuan was not being paid directly by Escalade or BAIEC but instead from Expert Base.  [Filing No. 86-1 at 9.]  Mr. Allshouse attested that only after addressing those concerns did they discuss the difference between Lai Yuan's quoted prices and BAIEC's prices, and that Mr. Wei reacted by "sitting in complete silence for several long, uncomfortable minutes," and "[w]hen he did start talking, he denied Lai Yuan's allegations and made allegations about Lai Yuan, including the factory's motives and capabilities."  [Filing No. 86-1 at 9.]  He further attested that for the rest of the morning, Mr. Wei "was sullen and largely unresponsive," and "seemed visibly angry at Lai Yuan and continually tried to discredit Lai Yuan as a viable business partner."  [Filing No. 86-1 at 9.]

Mr. Wei, on the other hand, attested that Mr. Allshouse and Mr. Fetherman immediately raised the issue of the differential between Lai Yuan's quotes and BAIEC's prices at the beginning of the meeting, showed him Lai Yuan's price quotes, and then "pushed [him] to accept Lai Yuan's price for future purchase orders." [Filing No. 70-8 at 2; 72-2 at 6.] Mr. Wei attested that he responded that BAIEC could not match Lai Yuan's price, but offered a proposal in the event that Escalade decided to work directly with Lai Yuan for new POCs, which involved Lai Yuan acquiring component parts on its own (not from BAIEC) and BAIEC placing orders, arranging shipments, and performing quality control. [Filing No. 72-2 at 6.] Mr. Wei attested that this would involve payment by Escalade to BAIEC of 5% of Lai Yuan's price, but that Mr. Allshouse and Mr. Fetherman indicated that they did not want BAIEC to handle Lai Yuan, and that Escalade's Shanghai office would work with Lai Yuan. [Filing No. 72-2 at 6.] Mr. Wei also attested that the discussions the morning of January 4 related only to new purchase orders and not existing ones, and that Mr. Allshouse and Mr. Fetherman also advised that they would give BAIEC new business involving developing basketball systems for Sports Authority. [Filing No. 72-2 at 6.] Mr. Wei claims that Escalade indicated it did not want Lai Yuan to know about the new business, and that he then met with Escalade's technical department manager, its engineer, and its category manager to discuss the Sports Authority business. [Filing No. 72-2 at 6-7.]

Mr. Allshouse attested that after a lunch break, he and Mr. Fetherman determined that they "needed concrete assurance that the dispute between Lai Yuan and BAIEC would not disrupt Escalade's supply chain; including assurance that BAIEC would not or could not retaliate against Lai Yuan and thereby compromise Escalade's supply chain." [Filing No. 86-1 at 9.] Mr. Wei attested that Mr. Allshouse and Mr. Fetherman presented him with an agreement that would give BAIEC twenty days to move the basketball business, including existing POCs, from BAIEC to Lai Yuan.

[Filing No. 70-9 at 2; Filing No. 72-2 at 7.] He attested that the agreement included a paragraph which allowed Escalade to hold back $500,000 of payment to BAIEC to insure uninterrupted business flow. [Filing No. 72-2 at 7.] Mr. Wei stated that he told them the provision was unreasonable, and that they agreed to remove the paragraph. [Filing No. 72-2 at 7.] The agreement also offered to pay BAIEC in full only for POCs on products shipped on or before January 20, 2013, but that products shipped after that date would be "revised and reissued through Shanghai, directly to Lai Yuan." [Filing No. 70-9 at 2.]

Mr. Wei attested that he ultimately refused to sign the agreement, stating that he needed time to think about it and discuss it with his boss. [Filing No. 72-2 at 7.] Mr. Allshouse attested that Mr. Wei offered to drop BAIEC's price to match Lai Yuan's price quote, but that Escalade rejected that offer because it did not address Escalade's concern about BAIEC retaliating against Lai Yuan and causing a gap in Escalade's supply chain. [Filing No. 86-1 at 10.] The meeting ended without an agreement, and on the way to the airport, Mr. Wei asked Mr. Lederman to "find a way to let BAIEC finish the POCs and be paid the negotiated price in the "FIRM ORDER" POCs in place at the time of [the] meeting." [Filing No. 72-2 at 7.] Mr. Wei attested – contrary to Mr. Allshouse's recollection of the meeting – that during the January 4 meeting "we did not discuss any issues with respect to BAIEC's performance [and] [n]o one from Escalade indicated that Lai Yuan had expressed concern over BAIEC's business practices, the lack of a formal contract between BAIEC and Lai Yuan, or anything of that nature." [Filing No. 72-2 at 7.]

### E. Communications After the January 4, 2013 Meeting

Shortly after the January 4 meeting, on January 7, Mr. Wei emailed Mr. Allshouse and Mr. Fetherman to express that he was shocked and saddened over losing Escalade's business. [Filing No. 70-10 at 5-7.] Mr. Wei stated, in part, "It is Escalade's choice who they want to do[] business

[with], we respect Escalade's decision….For all the open orders, we think BAIEC should finish it. Order has been confirmed by two parties, both part[ies] have the responsibil[ity] to respect it." [Filing No. 70-10 at 6.] Mr. Wei also advised Mr. Allshouse that if Escalade decided to do business with Lai Yuan directly, it should not let Lai Yuan know yet because Lai Yuan might not produce quality products to fill the current orders. [Filing No. 70-10 at 7.] Mr. Allshouse responded to Mr. Wei the same day, stating "to be clear, Escalade did not contact Lai Yuan directly or develop samples and Escalade did call you for the meeting to discuss and how you the factory prices in a[n] attempt to understand what value BAIEC was providing for the considerable difference in cost to us." [Filing No. 70-10 at 5.] Mr. Allshouse promised to get back to Mr. Wei in a few days regarding Mr. Wei's "proposal." [Filing No. 70-10 at 5.] Mr. Wei responded to Mr. Allshouse later that same day, and wrote that he understood that the January 4 meeting was to discuss pricing, and not to "tak[e] business from BAIEC right away." [Filing No. 70-10 at 4.]

Mr. Allshouse forwarded his email exchange with Mr. Wei to Mr. Chung, and Mr. Chung responded to Mr. Allshouse the next day that "[n]o doubt that we need to stop the business with [Mr. Wei] and I don't think so he knows what he is talking about." [Filing No. 70-10 at 3.] Mr. Chung emailed Mr. Allshouse again on January 9, 2013, stating "[w]e let [Mr. Wei] know that there is no turning point for Escalade to doing business with him. He should 100% understand. He should smart enough to take whatever he made from Escalade and say 'Thank you and Bye-bye'….We cancel all order that will ship after Jan 20th and place the order to Lai Yuan immedi-ately. With this PO in hand, we could raise the suppliers['] confidence at least." [Filing No. 70-11 at 2.]

On January 10, Mr. Allshouse emailed Mr. Wei and requested that he sign the agreement presented at the January 4 meeting, stating "[t]his is our decision and I hope we can move forward

based on the agreement." [Filing No. 70-12 at 2.] Mr. Wei responded later that day, stating that BAIEC respected Escalade's decision to move its basketball business to Lai Yuan, that Escalade "has the right to choose who they want to cooperate with on basketball business," but that "[w]e don't think moving some open orders to Laiyuan are correct. We think Escalade Sports should respect all the orders they replaced to BAIEC. These orders are all firm order, it must be implemented by both party. Please let BAIEC ship all open orders." [Filing No. 70-12 at 2.] Mr. Wei reiterated his concerns to Mr. Allshouse in a January 13, 2013 email. [Filing No. 70-13 at 15-17.] Mr. Allshouse responded to Mr. Wei on January 14, 2013, stating:

> We understood the meeting on January 4 with Dave and I would be challenging for you, although you stated that you thought Escalade Sports was "kicking you out of the business" because the factory told you it would happen….Escalade called you for the 1/4/2013 meeting to discuss and show you the factory quoted prices in hopes of understanding what value BAIEC was providing for the considerable difference in cost to us. If we saw that value we would continue the basketball business with you, if not we would move it to a factory direct business through our Shanghai office like we do all other Asia import business….
>
> In our 1/4/2013 [meeting] here at Escalade, you were unable to provide us with any detail or reason to believe in the value BAIEC was providing for the considerable cost difference. We stated that the business could not continue with this level for expense and the BAIEC costs for 2013 were creating problems for our business to remain competitive in the market. You commented that the factories cost to us was about 8% less than your cost. I asked you directly, if that was the case, please explain the value added by BAIEC for the balance of the difference. Again, you were unable to provide us with any detail or reason to believe in the value BAIEC was providing for the considerable cost difference.

[Filing No. 70-13 at 14.] Mr. Allshouse concluded his email by requesting that BAIEC sign the agreement presented at the January 4 meeting by noon the next day, or else "we will consider this business unacceptable for BAIEC to continue and move forward in our best interest." [Filing No. 70-13 at 15.]

Mr. Wei and Mr. Allshouse continued their email exchange over the next several days, but could not ultimately reach an agreement because they disputed terms relating to the timing of

BAIEC's payment to suppliers and because Mr. Wei thought the proposed agreement insinuated that BAIEC had done something wrong in the past. [Filing No. 70-13 at 5-13.] Mr. Allshouse confirmed that he did not think BAIEC had done anything wrong in the past, but that he had to "protect Escalade going forward." [Filing No. 70-13 at 4.] He also stated "[y]es, BAIEC margin was TOO MUCH and it is my fault Escalade didn't work harder and understand this before." [Filing No. 70-13 at 4.] Mr. Wei responded the same day that "BAIEC will pay all our factories, but it doesn't need to report [to] you…." [Filing No. 70-13 at 3.]

### F. Escalade Cancels All Orders With BAIEC

On January 16, Mr. Fetherman emailed Mr. Wei and stated "[t]his back and forth conversation has gone on way to [sic] long….It is too bad it has come to this point, however, we will be cancelling all Basketball related orders with BAIEC and will be handling everything through our China office." [Filing No. 70-13 at 2.] Mr. Wei responded later that day, asking how Escalade would compensate BAIEC for all open orders, noting that all parts Lai Yuan had in its possession belonged to BAIEC, and that if Lai Yuan produced products with those parts without BAIEC's permission it would be breaking the contract. [Filing No. 70-13 at 2.] Mr. Wei emailed both Mr. Allshouse and Mr. Fetherman on January 17, stating again that Escalade should let BAIEC finish the outstanding POCs and offering a price reduction. [Filing No. 70-14 at 6-7.] Mr. Fetherman responded the same day, stating that Lai Yuan had approached Escalade with concerns about BAIEC, which Escalade "saw…as a real threat to our business due to the described inability for you to resolve issues with the factory and the threat of order cancellation by the factory." [Filing No. 70-14 at 5.] Mr. Fetherman further stated that this was when Escalade became aware of "the considerable cost difference" and requested the January 4 meeting "to better understand BAIEC reason for such pricing and discuss our concerns about your relationship with the factory. Our

focus was business resolution, your focus was with discrediting the factory in our meeting and in follow up emails." [Filing No. 70-14 at 5.] Mr. Fetherman advised that Escalade was cancelling all orders with BAIEC, and would pay the $905,113.76 due to BAIEC for products shipped to date in four installments over the next three weeks. [Filing No. 70-14 at 5.] He also stated that Escalade would pay BAIEC 5% commission for all cancelled shipments which were to be shipped after January 20, 2013, and 5% of the original POC amount for products originally scheduled to ship within a month and payable at the end of each month, to continue from the end of February through May. [Filing No. 70-14 at 5-6.] Finally, he stated "[t]his is no longer negotiable and how we will move forward with the business." [Filing No. 70-14 at 6.]

Mr. Wei responded on January 18, stating that Lai Yuan had parts that belonged to BAIEC, which BAIEC had purchased from the Component Factories and sent to Lai Yuan. [Filing No. 70-14 at 4.] Mr. Wei rejected Escalade's proposal to cancel the POCs with a 5% commission, and his proposal to pay BAIEC on the previously shipped orders in installments, noting that Escalade had paid the first installment but owed much more. [Filing No. 70-14 at 4.] On January 18, 2013, Mr. Wei emailed Lori Reichert of Escalade in response to her email that Escalade was cancelling more orders, stating that he did not agree to the cancellations. [Filing No. 71-1 at 2.] Escalade never directly addressed Mr. Wei's concern that Lai Yuan had possession of parts that BAIEC had purchased from the Component Factories – Mr. Allshouse viewed that as a matter between Lai Yuan and BAIEC. [Filing No. 94-2 at 43-44.]

Mr. Wei emailed Escalade on January 25, 2013, asking when BAIEC would receive the next payment. [Filing No. 71-9 at 9.] Mr. Allshouse responded that Escalade would pay if BAIEC "resolved this payment issue with the suppliers as soon as possible and provide us proof of payment and or a payment schedule agreement with the individual suppliers. As soon as we receive

documentation of payment resolution with suppliers, Escalade will immediately resume the wire payments to you as defined above." [Filing No. 71-9 at 8-9.] Mr. Wei responded on January 27 that BAIEC had paid all of the factories, including Lai Yuan, and also advised that BAIEC had sent all component parts that Lai Yuan would need for the February shipments and most of the March shipments. [Filing No. 71-9 at 8.] Mr. Allshouse emailed Mr. Wei the next day, again stating that BAIEC must pay suppliers immediately and that "[i]t is our understanding, after direct communication from all suppliers, that no supplier has received further payment from BAIEC for product shipped or balance due prior to 1/18/2013. Due to outstanding debt with BAIEC, suppliers are asking Escalade Sports for Guarantee letters." [Filing No. 71-9 at 7.] Mr. Wei responded the same day, stating again that BAIEC's suppliers were being paid according to their usual terms (within 30 days). [Filing No. 71-9 at 6-7.] Mr. Wei noted that BAIEC had paid Lai Yuan $240,000 on January 9. [Filing No. 71-9 at 6-7.]

Mr. Allshouse emailed Mr. Wei on January 28, stating that suppliers other than Lai Yuan have stated that they do not have a written agreement with BAIEC, that Lai Yuan had said it did not receive payment last week even though Escalade had paid BAIEC $225,000, and that BAIEC's total debt for each supplier is greater than what Escalade owes BAIEC. [Filing No. 71-9 at 6.] Mr. Allshouse stated "John, what insurance do we have that all suppliers will get paid other than your word? All suppliers ask Escalade for guarantee letter, now I am asking you for the same. If you have copies of the sign agreements with each supplier, please send me copy along with a guarantee letter stating you responsible for payments to all suppliers." [Filing No. 71-9 at 6.] Mr. Wei responded that "Escalade hold on payment, not BAIEC, and now you ask BAIEC keep paying factory but could get your paid, how can I do this? You have hold my payment more than $730,000, it is a lot. You have not the right ask me keep wire factories but without getting your

pay." [Filing No. 71-9 at 5.] Mr. Wei asked for proof regarding BAIEC's alleged lack of payment to suppliers. [Filing No. 71-9 at 5.]

On February 5, 2013, Mr. Allshouse emailed Mr. Wei with "the proof you requested and our action plan, effective immediately." [Filing No. 71-9 at 3.] Mr. Allshouse stated that all POCs prior to January 18, 2013 were paid in full by Escalade to BAIEC, but that BAIEC had not paid certain suppliers since January 15. [Filing No. 71-9 at 3.] Mr. Allshouse stated that "Glass backboard supplier and Actuator supplier need Escalade USA to issue a guarantee letter that if they didn't receive any BAIEC payment in the future then Escalade will [be] responsible to solve the issue." [Filing No. 71-9 at 3.] Mr. Allshouse stated "We now firmly believe it is your intent to interrupt our basketball production, delivery and overall business." [Filing No. 71-9 at 4.] Mr. Allshouse proposed that Escalade would pay its balance as follows: $636,926.75 directly to Lai Yuan, $286,529.70 to the Component Factories, and $243,342.69 to BAIEC. [Filing No. 71-9 at 4-5.][2]

Mr. Wei responded to Mr. Allshouse on February 8, 2013, stating "This letter is sent as an immediate demand for payment for the current entire balance due to BAIEC. There is no dispute that Escalade Sports placed orders with BAIEC that have not been paid yet. You have acknowledged you owe the money, but will not provide immediate payment on what you owe. In an effort to avoid immediate payment, you attempt to create misconstrue the events. We supply goods to you. Your payment to us is not and should not be dependent on BAIEC relationship with its

---

[2] Internal Escalade emails indicate that arrangements were made to wire $636,926.75 directly from Escalade to Lai Yuan, but Escalade expected to receive a credit in that amount from Lai Yuan in the event BAIEC paid Lai Yuan for that amount. [Filing No. 71-10 at 2-4; Filing No. 76-1.] Lai Yuan has sued BAIEC in China to recover that amount. [Filing No. 72-2 at 10.]

suppliers.  In fact, you have hurt the relations we have with our suppliers because you have held payments."  [Filing No. 71-9 at 2.]

Ultimately, Escalade paid Lai Yuan directly for $638,636.13, which was the amount it believed BAIEC owed Lai Yuan.  [Filing No. 86-1 at 14.]  Escalade informed BAIEC that this direct payment to Lai Yuan was "a credit for the amount owed by Escalade to BAIEC for product delivered."  [Filing No. 86-1 at 14.]  BAIEC would not recognize this amount as a credit, and withheld the bills of lading on shipments from January 5, January 12, January 18, and January 19 until Escalade paid on February 20, 2013, via an escrow agent.  [Filing No. 72-2 at 10.]  After cancelling the POCs and ceasing dealing with BAIEC, Lai Yuan continued to use parts from the Component Factories that belonged to BAIEC because Lai Yuan believed BAIEC owed it money so it was justified in using the parts.  [Filing No. 93-6 at 6.]  As of July 2014, BAIEC still had not paid some of the Component Factories.  [Filing No. 94-4 at 17-20.]  BAIEC asserts that Escalade has not paid it for 113 outstanding POCs that it cancelled, totaling over $4 million.  [Filing No. 69 at 16.]

### G.  The Lawsuit

On November 21, 2013, BAIEC filed the instant lawsuit against Escalade.  [Filing No. 1.] BAIEC filed the operative Second Amended Complaint for Damages on December 19, 2013, asserting claims against Escalade for breach of contract, unjust enrichment, and quantum meruit. [Filing No. 17 at 4-6.]  Escalade then asserted counterclaims against BAIEC for unjust enrichment, promissory estoppel, and common law indemnity.  [Filing No. 19 at 13-15.]

### III.
### DISCUSSION

BAIEC has moved for summary judgment on its breach of contract claim, and on all of Escalade's counterclaims.  [Filing No. 68.]  BAIEC argues, among other things, that the POCs

were valid contracts, Escalade breached them, and BAIEC did not repudiate the POCs so the breach was not excused.  [*See* Filing No. 69.]

The Court notes at the outset that Escalade has not cross-moved for summary judgment. Escalade states in its response brief that "[i]n the event the Court finds that no such dispute of material facts exists, Escalade respectfully requests that the Court still deny BAIEC's motion and enter summary judgment in Escalade's favor pursuant to Fed. R. Civ. P. 56(f)."  [Filing No. 86 at 16.]  The Court will not consider this statement, which appears in a footnote, to be a cross-motion for summary judgment on Escalade's behalf.  *See* Local Rule 7-1(a) ("Motions must be filed separately….A motion must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court").  Accordingly, the Court's inquiry is limited to whether BAIEC is entitled to judgment as a matter of law on its breach of contract claim and on Escalade's counterclaims.

### A.  Choice of Law

A federal court sitting in diversity[3] must apply the choice of law provisions of the forum state.  *Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 879 (7th Cir. 2009) ("Because the district court's subject-matter jurisdiction was based on diversity, the forum state's choice of law rules determine the applicable substantive law").  The parties agree that Indiana law applies to the claims and counterclaims here.  [*See* Filing No. 69 at 16-35 (BAIEC citing to Indiana law to support arguments) and Filing No. 86 at 18-35 (Escalade relying upon Indiana law).]  Absent a disagreement, the Court will apply Indiana law.  *Mass. Bay Ins. Co. v. Vic Koenig Leasing*, 136 F.3d 1116,

---

[3] The Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332, as BAIEC is a Chinese company which most closely resembles a United States corporation and is a citizen of China, Escalade is an Indiana corporation with its principal place of business in Indiana, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  [*See* Filing No. 24; Filing No. 27.]

1120 (7th Cir. 1998); *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits….Courts do not worry about conflict of laws unless the parties disagree on which state's law applies. We are busy enough without creating issues that are unlikely to affect the outcome of the case (if they were likely to affect the outcome the parties would be likely to contest them)") (emphasis added).

### B. Breach of Contract Claim

BAIEC argues that the POCs were valid contracts, and that Escalade breached the POCs without a valid legal excuse. [Filing No. 69 at 17-25.] Escalade does not dispute that the POCs were valid contracts under Indiana law nor that it breached them, but argues that its breach was excused because BAIEC repudiated the POCs and because the Vendor Partnership Guide provided it with a right to terminate the POCs under the circumstances. [Filing No. 86 at 18-31.] BAIEC argues that it did not anticipatorily repudiate the contracts because:

- It did not give Escalade any indication that it would refuse to perform;

- Escalade did not have reasonable grounds for insecurity;

- Escalade never demanded in writing adequate assurance from BAIEC or gave BAIEC any opportunity to cure any alleged issues; and

- Escalade had no legal right to demand that BAIEC change its business policies after contracting with BAIEC.

[Filing No. 69 at 17-25.] It also asserts that Escalade had no excuse to breach based on the Vendor Partnership Guide. [Filing No. 69 at 24-25.] BAIEC argues that it is entitled to lost profits on the POCs, and costs reasonably incurred (including the cost of the component parts that BAIEC had purchased to use in filling the POCs). [Filing No. 69 at 25-27.]

The Court grants in part BAIEC's Motion for Summary Judgment to the extent that it finds as a matter of law that Escalade breached the outstanding POCs by not complying with their terms. This finding is not a finding of liability, however, as the Court must attempt to determine whether Escalade's breach was excused under either § 26-1-2-609 or the Vendor Partnership Guide.

### 1. *Repudiation Under Indiana Code § 26-1-2-609*

Section 26-1-2-609 of Indiana's version of the Uniform Commercial Code provides that:

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

\* \* \*

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty (30) days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

I.C. § 26-1-2-609.

### a. Reasonable Grounds for Insecurity

BAIEC argues that Escalade did not have reasonable grounds for insecurity because BAIEC had been filling purchase orders for Escalade through Lai Yuan for ten years using the same procedures, routinely paid its contractors on time during that ten years, and was never late in paying its suppliers. [Filing No. 69 at 21.] BAIEC asserts that Escalade had no reason to believe BAIEC was late paying Lai Yuan. [Filing No. 69 at 21.] BAIEC also contends that Escalade's management testified that Lai Yuan had general concerns over some of BAIEC's business practices, but nothing specific. [Filing No. 69 at 21-22.] BAIEC argues that the only circumstance

that had changed was that Escalade began communicating directly with Lai Yuan, and realized that it could make a bigger profit if BAIEC were not involved.  [Filing No. 69 at 22.]

Escalade responds that Lai Yuan was indisputably a key part of its supply chain, and that BAIEC had created a rift with Lai Yuan by refusing to enter into a written agreement, by lying to Lai Yuan about the source of funds used to pay Lai Yuan, by withholding funds from Escalade which were intended to compensate Lai Yuan for replacement parts, and by threatening to take BAIEC's business to another factory.  [Filing No. 86 at 20.]  Escalade argues that this rift "was so pronounced that at its very first meeting with Escalade without BAIEC, Lai Yuan informed Escalade that it would not continue doing business under the current arrangement with BAIEC." [Filing No. 86 at 20.]  Escalade asserts that Mr. Wei refused to give assurances regarding the stability of Escalade's supply chain, and his "demeanor during the meeting led Escalade to believe that BAIEC would retaliate against Lai Yuan and disrupt Escalade's supply chain."  [Filing No. 86 at 21.]

On reply, BAIEC argues that Escalade's alleged concerns with the lack of a written contract between Lai Yuan and BAIEC and which bank account delivered payment to Lai Yuan were not material grounds for insecurity, and Escalade never asked BAIEC to take steps to address those concerns.  [Filing No. 91 at 3-4.]  Additionally, BAIEC asserts that Escalade viewed Lai Yuan's complaints regarding BAIEC as "an opportunity to terminate the business relationship with BAIEC and deal directly with Lai Yuan," and any insecurity about BAIEC retaliating was really a ruse to justify Escalade's decision to stop doing business with BAIEC, and not because of Lai Yuan's concerns.  [Filing No. 91 at 4.]  BAIEC also notes that Escalade has not presented any reasons for cancelling existing contracts, rather than just ceasing to enter into new POCs.  [Filing No. 91 at 4-5.]  BAIEC argues that Mr. Yu's statements about not doing business with BAIEC in

the future were in the context of shifting business directly to Escalade, so were really "an expression of dissatisfaction with the status quo and an asserted desire for a change in the indeterminate future…." [Filing No. 91 at 5.] BAIEC points out that Mr. Yu's concerns with BAIEC dated back to 2010, but Lai Yuan continued to work with BAIEC for several more years, until Escalade cancelled the remaining POCs. [Filing No. 91 at 5.] Additionally, BAIEC argues, Escalade continued to enter into POCs after Mr. Yu voiced his concerns in September 2012. [Filing No. 91 at 6.] Finally, BAIEC argues that Escalade has not presented any evidence that BAIEC had ever previously failed to pay suppliers, including Lai Yuan. [Filing No. 91 at 6.]

Under § 26-1-2-609, a party who has reasonable grounds for insecurity regarding the other party's performance may request in writing assurances that the party will, in fact, perform. I.C. § 26-1-2-609(1). Whether reasonable grounds for insecurity exist are determined "according to commercial standards." I.C. § 26-1-2-609(2). Indiana case law interpreting and applying § 26-1-2-609 is sparse, but the official comments note that:

> Under commercial standards and in accord with commercial practice, a ground for insecurity need not arise from or be directly related to the contract in question….Thus a buyer who falls behind in "his account" with the seller, even though the items involved have to do with separate and legally distinct contracts, impairs the seller's expectation of due performance.

I.C. § 26-1-2-609, cmt. 3. Here, Escalade relies upon a "rift" between BAIEC and Lai Yuan brought about by four issues: (1) the lack of a written contract between BAIEC and Lai Yuan; (2) the fact that Lai Yuan was being paid from a Hong Kong bank account controlled by Mr. Wei and not by BAIEC; (3) the fact that BAIEC did not pay Lai Yuan for manufacturing replacement parts; and (4) BAIEC's threat to take its business to another factory. [Filing No. 86 at 20.] These concerns were brought to Escalade's attention at least by September 2012, when Mr. Yu conveyed them to Mr. Chung

during a meeting. [Filing No. 86-7 at 2.] It is difficult to tell, however, what the context of their discussions was and although the parties have presented numerous emails and testimony from various depositions regarding this issue, and do not dispute the content of the emails or testimony, they do dispute the inferences to be drawn from that evidence.

Whether Escalade had reasonable grounds for insecurity is a very fact-specific inquiry, and the Court cannot conclude as a matter of law that it did or did not at this point in the litigation. Particularly for this inquiry, the context of discussions regarding Lai Yuan's concerns is important. On the one hand, it is undisputed that Lai Yuan was a key part of Escalade's supply chain, that without Lai Yuan Escalade could not fulfill its orders, and that replacing Lai Yuan in the supply chain could take six to twelve months. In other words, a credible threat from Lai Yuan to stop working with BAIEC had serious implications for the continuity of Escalade's business. On the other hand, the evidence indicates that Mr. Yu's expression of concern came simultaneously with, or immediately preceded, a discussion between Escalade and Lai Yuan regarding pricing, and the fact that Lai Yuan could provide Escalade with its products for a cheaper price if it cut out BAIEC from the transaction. [*See* Filing No. 72-11; Filing No. 72-12.] So, it is possible that Mr. Yu's complaints regarding BAIEC were drummed up to allow Lai Yuan to do business with Escalade directly, and not an indication that Lai Yuan would have any other legitimate reason to stop working with BAIEC at Escalade's expense.

Indeed, it may well be that BAIEC's characterization of the events is correct. But the Court cannot draw this conclusion based on the evidence submitted thus far. *See Remuda Jet Five LLC v. EMBRAER – Empressa Brasiliera de Aeronautica, S.A.*, 2012 WL 1142296, *9 (S.D. N.Y. 2012)* ("Given the factually intensive nature of the inquiries, 'the standard is *high* for [reaching] a finding…as a matter of law" regarding whether a party had reasonable grounds for insecurity and

whether there was adequate assurance of due performance) (emphasis in original). Accordingly, the Court cannot conclude as a matter of law that Escalade did not have reasonable grounds for insecurity when it came to BAIEC performing under the POCs. *See Gruppo Essenziero Italiano, S.p.A. v. Aromi D'Italia, Inc.*, 2011 WL 3207555, *6 (D. Md. 2011) (summary judgment denied where "a reasonable jury could find that [plaintiffs] did not have reasonable grounds to believe that [defendant] had no intention of paying any outstanding debt"). For purposes of its analysis here only, however, the Court will assume that Escalade had reasonable grounds for insecurity and will discuss the other requirements of § 26-1-2-609.

### b. Demand for Adequate Assurance of Performance

BAIEC also argues that even if there were a factual question regarding whether Escalade had reasonable grounds for insecurity, its breach is not excused under § 26-1-2-609 because it did not demand adequate assurance of performance in writing. [Filing No. 69 at 22-23.] BAIEC explains that although Escalade presented it with a proposed agreement at the January 4 meeting that purportedly was to ensure uninterrupted business flow, the proposed agreement was really Escalade's attempt to cancel the POCs and avoid its obligations according to the pricing contained in the POCs. [Filing No. 69 at 23.]

Escalade responds that its request for adequate assurance did not have to be in writing but that, in any event, it did request in writing several times that BAIEC provide it with adequate assurance, including:

· Its January 4, 2013 proposal, wherein it stated "[i]t is understood that a transition period is required to be supported by BAIEC to insure uninterrupted material and business flow in addition to transitioning all quality control and inspections at the factory," [Filing No. 86 at 24 (citing Filing No. 86-1 at 17)];

· An email from Mr. Allshouse to Mr. Wei which Escalade argues "stress[ed] that Escalade needed assurances that its supply chain would remain uninterrupted," [Filing No. 86 at 24 (citing Filing No. 86-1 at 25-27)];

- A January 15, 2013 email from Mr. Allshouse to Mr. Wei wherein Mr. All-shouse proposed a reduction in price for open orders, among other things, and noted that Escalade "will continually monitor the factory, inventory levels, supplier deliveries and supplier debt level with BAIEC," will hold payment if Escalade feels there is a possibility of business interruption, and that the proposal is contingent on "no interruption of supplier deliveries, business flow or shipment delay related to BAIEC business practice," [Filing No. 86 at 24 (citing Filing No. 86-1 at 31-32)];

- An email from Mr. Allshouse where, after "BAIEC pushed back on Escalade's proposed provisions ensuring that its supply chain would remain intact and un-interrupted, Escalade reiterated that BAIEC's payment would be premised on uninterrupted service," [Filing No. 86 at 24 (citing Filing No. 86-1 at 31-32)]; and

- A January 16, 2013 email from Mr. Allshouse to Mr. Wei which contained the provisions of a "new agreement" between the parties including one that stated "BAIEC will pay suppliers and show Escalade evidence of such payment within five days of Escalade payment to BAIEC," [Filing No. 86 at 24 (citing Filing No. 86-1 at 39)].

Escalade argues that even if the requested assurances were not contained in the POCs (*e.g*., BAIEC providing timely proof that it was paying its suppliers after being paid by Escalade), this was not improper under § 26-1-2-609. [Filing No. 86 at 24-25.]

On reply, BAIEC argues that Escalade never requested assurances in writing, and did not reference Lai Yuan's concerns with its business practices until January 17, 2013 – the day after Escalade cancelled all remaining POCs. [Filing No. 91 at 7.] BAIEC contends that Escalade's demands regarding payment of suppliers were part of Escalade's proposal to terminate the POCs without paying as agreed. [Filing No. 91 at 7.] BAIEC reiterates that a demand for assurances must be in writing and that, even if a demand does not have to be in writing where a party has a clear understanding that adequate assurance is being sought, BAIEC did not have that understanding. [Filing No. 91 at 8.] BAIEC notes that communications between it and Escalade relating to the January 4 meeting focused on pricing, and what value BAIEC was providing. [Filing No. 91 at 8.]

The Court first considers whether a request for adequate assurance under § 26-1-2-609 must be in writing. As noted above, Indiana case law interpreting § 26-1-2-609 is sparse, and it does not appear that an Indiana court has squarely addressed whether a request for adequate assurances under that provision must be in writing. Accordingly, this Court must predict how an Indiana court would resolve that issue. *See MindGames, Inc. v. Western Pub. Co., Inc.*, 218 F.3d 652, 655-56 (7th Cir. 2000) ("The rule is that in a case in federal court in which state law provides the rule of decision, the federal court must predict how the state's highest court would decide the case, and decide it the same way").

Most recently, in *Hawa v. Moore*, 947 N.E.2d 421, 427 (Ind. Ct. App. 2011), the Indiana Court of Appeals noted that while a demand for adequate assurance for the performance of services need not be in writing, "[a]n exception applies to contracts for the sale of goods, where demands of adequate assurance must be in writing. *See* U.C.C. § 2-609; Ind. Code § 26-1-2-609." Although the court's statement was *dicta*, the Seventh Circuit has recognized that a request for adequate assurance under § 2-609 must be made in writing under Illinois law. *Chronister Oil Co. v. Unocal Refining and Marketing (Union Oil Co. of California)*, 34 F.3d 462, 464 (7th Cir. 1994) (noting that "the most recent Illinois cases insist on strict compliance with the terms of the section [and require that a demand for adequate assurance be made in writing]"); *see also Koursa, Inc. v. manroland, Inc.*, 971 F.Supp.2d 765, 792 (N.D. Ill. 2013) (requiring demand for adequate assurance under § 2-609 be in writing); *Federated Retail Holdings, Inc. v. Sanidown, Inc.*, 2009 WL 4927560, *5 (S.D. N.Y. 2009) ("The Court is persuaded that, at least when the parties disagree as to whether adequate assurances were demanded, '[t]he requirement that a request for assurances be in writing serves to preclude claims, such as the present, that are easy to assert but difficult to

refute. This court therefore sees no reason to disregard the literal wording of the section'….Plain-tiffs' failure to proffer any evidence that they made a written demand for adequate assurances from Defendant is fatal to their Section 2-609 claim") (citations omitted). Based on the Indiana Court of Appeals' *dicta* in *Hawa*, and on the Seventh Circuit's interpretation of mirror statutes, the Court finds as a matter of law that Escalade's request for adequate assurances had to be in writing in order for Escalade to be able to invoke § 26-1-2-609.

Much like analyzing whether Escalade had reasonable grounds for insecurity, the inquiry into whether Escalade made a written demand for adequate assurances is very context-specific. Escalade has pointed to emails which focus on its attempt to work out an agreement with BAIEC for satisfaction of its remaining POCs at a reduced price, and without business interruption. Again, the Court finds that the trier of fact could reasonably conclude in Escalade's favor if certain infer-ences were drawn: that Escalade was worried about the relationship between BAIEC and Lai Yuan, and its proposals for the satisfaction of existing POCs (some of which addressed paying suppliers in a timely fashion) were meant to provide Escalade with adequate assurances that the remaining POCs would be filled without interruption. This conclusion is bolstered by the fact that Lai Yuan had expressed concern to Escalade, and that Escalade's business would be severely af-fected if Lai Yuan ceased doing business with BAIEC.

Or, if other inferences were drawn, the finder of fact could reasonably believe that Esca-lade's proposals (and the emails relating to those proposals) were nothing more than an attempt to pay less for the outstanding POCs, rather than legitimate requests for adequate assurances of future performance. This conclusion is supported by the emphasis on pricing that many of the emails and proposals reflect, the fact that Escalade has not presented evidence that it requested that BAIEC enter into a written agreement with Lai Yuan (which was Lai Yuan's original concern),

and the fact that the requests for adequate assurance Escalade points to all took place in the context of Escalade attempting to cease doing business with BAIEC so it could deal with Lai Yuan directly at a lower cost. The Court also notes a December 15, 2012 email from Mr. Allshouse to Mr. Chung – sent before the initial meeting with Mr. Wei to discuss Lai Yuan's concerns – wherein Mr. Allshouse presents an exit strategy for Escalade which includes the statement that "worst case, we'll tell [Mr. Wei] that we'll pay for all POs that have shipped, but we are paying the factory direct and then paying you." [Filing No. 75-1 at 2.] This email indicates that perhaps Escalade's cancellation of the outstanding POCs and its decision to pay Lai Yuan directly had nothing at all to do with Lai Yuan's concerns about being paid, but everything to do with Escalade switching to a cheaper supplier and reducing its risk that BAIEC would retaliate for that switch.

In sum, while Escalade's request for adequate assurances had to be in writing, the Court finds that a reasonable fact finder could conclude that the emails and proposals Escalade points to could be construed as such requests. The Court expresses some skepticism with this conclusion based on the context of the communications – specifically, that Escalade was looking for a way to cease business with BAIEC because it had learned that it could pay less if it dealt directly with Lai Yuan – and on the fact that Mr. Allshouse was emailing Mr. Chung before the January 4 meeting that Escalade would cancel the outstanding POCs and pay Lai Yuan directly for any amounts owed at that point. There are enough outstanding issues of fact, however, that the Court cannot find as a matter of law at the summary judgment stage that Escalade did not request adequate assurances in writing. *See Ward Transfomer Co., Inc. v. Distrigas of Massachusetts Corp.*, 779 F.Supp. 823, 826 (E.D. N.C. 1991) (summary judgment denied where "[a] reasonable trier of fact could determine that [plaintiff's] letter of May 4, 1990 or the April 27 invoice were appropriate demands for reasonable assurances….").

Because genuine issues of fact exist regarding whether Escalade had reasonable grounds for insecurity and whether it requested adequate assurances of performance in writing, the Court cannot find as a matter of law that Escalade's breach of the POCs was not excused under § 26-1-2-609.

### 2. *The Vendor Partnership Guide*

Escalade also argues that it was entitled to cancel the POCs under the Vendor Partnership Guide, which provides that:

> **DELIVERY/CANCELLATION:**….If deliveries of materials or services are not made as specified, or if all specifications are not fulfilled, or if our requirements change, we reserve the right, without liability and in addition to any other rights and remedies, to cancel any part or all of our purchase orders by notice to you as to items not shipped and to purchase substitute items elsewhere, in which event you shall reimburse us for all additional costs and expenses incurred within seven (7) days of our notice to you of such additional costs and expenses.

[Filing No. 72-5 at 8.] Escalade argues that it is irrelevant whether BAIEC actually received a copy of the Vendor Partnership Guide, because it is incorporated by reference into the POCs. [Filing No. 86 at 30.] Escalade then relies upon the report of Dennis Kelley, Escalade's expert witness, to argue that BAIEC breached its duties as Escalade's agent by, among other things, "causing the rift with Lai Yuan," so did not provide services "as specified." [Filing No. 86 at 31.]

BAIEC replies that even if the Vendor Partnership Guide were binding absent receipt, it does not provide Escalade with an excuse for breaching the POCs. [Filing No. 91 at 10.] BAIEC asserts that Escalade does not point to any "specified standard that was not met," and that "as specified" as used in the Vendor Partnership Guide really means "consistent with the engineering/design specifications." [Filing No. 91 at 10-11.] BAIEC also notes that, although Escalade claims that the Vendor Partnership Guide allows it to cancel the POCs if "circumstances change," that language is not contained within the Vendor Partnership Guide. [Filing No. 91 at 11.] BAIEC

states that "[t]he only change of circumstances was that Escalade desired to have the same require-ments fulfilled directly by Lai Yuan instead of honoring its contracts with BAIEC." [Filing No. 91 at 11.] BAIEC also argues that Escalade's suggestion that BAIEC breached agency duties is incorrect, because the relationship between Escalade and BAIEC was one of buyer and seller. [Filing No. 91 at 12.]

Escalade points to two reasons why the Vendor Partnership Guide allowed it to cancel the outstanding POCs – specifically, because BAIEC breached its duties as Escalade's agent by "caus-ing the rift with Lai Yuan" and because "circumstances changed." But, even assuming BAIEC was bound by the Vendor Partnership Guide, the Court finds Escalade's arguments unavailing. First, Escalade relies upon its expert report (the "Kelley Report") to argue that BAIEC was its agent, breached its duties as agent by causing a rift with Lai Yuan and, because it caused a rift, did not deliver services "as specified." The Court cannot conclude as a matter of law that BAIEC was acting as Escalade's agent. The POCs do not indicate such a relationship, nor does the Vendor Partnership Guide itself. Additionally, the Kelley Report's presumption that BAIEC, or Mr. Wei, was acting as Escalade's agent is an impermissible legal conclusion under Fed. R. Ev. 702, which prohibits an expert from opining on an ultimate issue when the opinion does not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Ev. 702. When an expert opines regarding a legal conclusion, he does not assist the trier of fact because he is "merely tell[ing] the jury what result to reach…." *Peoples State Bank v. Stifel, Nicolaus & Co., Inc.*, 2013 WL 1024917, *8 (S.D. Ind. 2013) (citations and quotations omitted); *see also Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process") (citations and quotations omit-ted); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003)

("expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"); *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*, 2007 WL 1850858, *9 (N.D. Ind. 2007)* (expert's opinion regarding whether party had "special relationship" with another party and had accepted "additional duties" was inadmissible legal conclusion because whether the relationship existed was a question of law for the court). Accordingly, the Court finds that the Kelley Report is excluded insofar as it opines or presumes that BAIEC, or Mr. Wei, was acting as Escalade's agent.

Additionally, the Vendor Partnership Guide does not address the relationship between BAIEC or Escalade at all, and provides no indication that its reference to "services" relates to "agency" services provided by BAIEC to Escalade. Escalade also has not presented any evidence that BAIEC's dealings with Lai Yuan would constitute a breach of any agency duties, even if such an agency relationship existed. The Court finds that the Vendor Partnership Guide's provision allowing cancellation when "services are not made as specified" does not apply here.

Second, Escalade argues that the Vendor Partnership Guide allowed it to cancel the POCs if "circumstances changed," [Filing No. 86 at 30.] But the Vendor Partnership Guide does not contain any such language, and instead applies when "requirements change." Escalade has not presented any evidence that, in the context of the Delivery/Cancellation provision, this language related to anything other than the goods Escalade required to satisfy its orders. And there is no evidence that Escalade required fewer products to satisfy its open orders, and thus wanted to cancel some outstanding orders based on this provision. Indeed, Escalade was attempting to switch its thriving business to Lai Yuan. This is not the type of change in requirements the Vendor Partnership Guide contemplates. Accordingly, the Court grants summary judgment in favor of BAIEC to the extent that it finds the Vendor Partnership Guide did not excuse Escalade's breach.

### 3. Conclusion on BAIEC's Breach of Contract Claim

In sum, the Court grants BAIEC's Motion for Summary Judgment to the extent that it finds that Escalade breached the POCs but, because there are genuine issues of fact regarding whether Escalade had reasonable grounds for insecurity and whether it requested adequate assurance of performance in writing from BAIEC, the Court denies BAIEC's Motion for Summary Judgment as to whether Escalade's breach was excused. *See IPF/Ultra Ltd. Partnership v. UP Improvements, LLC, 2008 WL 3896746, *6 (N.D. Ind. 2008)* (summary judgment inappropriate on plaintiff's breach of contract claim where questions of fact existed regarding whether defendant's affirmative defense was viable).[4] The Court notes, however, that it might be proper to reach the conclusions that BAIEC seeks if the Court were not limited by the boundaries of summary judgment, and that it will be Escalade's burden at trial to show that it can properly avail itself of § 26-1-2-609. The Court does find as a matter of law, however, that the Kelley Report is excluded to the extent it opines or is premised on BAIEC's or Mr. Wei's role as Escalade's agent, and that the Vendor Partnership Guide is not a defense to Escalade's breach of the outstanding POCs.

### C. Escalade's Counterclaims

BAIEC seeks summary judgment on all of Escalade's counterclaims, which the Court will address in turn.

### 1. Unjust Enrichment

Escalade alleges in its unjust enrichment counterclaim that BAIEC received a benefit from Escalade when Escalade paid BAIEC's debt directly to Lai Yuan, and that "BAIEC impliedly requested that Escalade convey this benefit to BAIEC." [Filing No. 19 at 13.] BAIEC argues that

---

[4] Because the Court is denying BAIEC's Motion for Summary Judgment as to its breach of contract claim, it will not consider BAIEC's argument that I.C. § 26-1-2-708(2) is the proper measure of damages for Escalade's breach of the POCs at this time. [*See* Filing No. 69 at 25-27.]

Escalade's unjust enrichment counterclaim fails because BAIEC did not receive a benefit from Escalade's direct payment to Lai Yuan since Lai Yuan is suing BAIEC in China to recover the same amount of money, BAIEC did not expressly or impliedly request that Escalade pay Lai Yuan directly, and Escalade is not entitled to equitable relief based on its actions. [Filing No. 69 at 29-31.] Escalade responds that BAIEC still received a benefit from its payment to Lai Yuan, even though Lai Yuan is suing BAIEC in China, and BAIEC is contesting that lawsuit in any event. [Filing No. 86 at 32.] Escalade also argues that BAIEC's refusal to pay Lai Yuan "can be fairly said to have been the equivalent of an implied request for Escalade to pay Lai Yuan directly on Escalade's behalf." [Filing No. 86 at 33.] Escalade denies that it had unclean hands, and asserts that "[i]t was BAIEC that imperiled Escalade's supply chain through its actions." [Filing No. 86 at 33.] BAIEC reiterates its arguments on reply, and also notes that Lai Yuan has agreed to transmit any amount it recovers against BAIEC in the China lawsuit to Escalade, so Escalade could recover twice if it succeeds on its counterclaim here. [Filing No. 91 at 12-14.]

To prevail on a claim of unjust enrichment under Indiana law, Escalade must establish that it "conferred a measurable benefit on [BAIEC] under circumstances in which [BAIEC's] retention of the benefit without payment would be unjust….Recovery under this theory only requires [Escalade] to establish that [BAIEC] impliedly or expressly requested the benefits be conferred….However, a party who has not expressly or impliedly requested the benefit is under no obligation to pay for the benefit." *Garage Doors v. Morton*, 682 N.E.2d 1296, 1303 (Ind. Ct. App. 1997) (citations omitted). The Court finds that Escalade did not confer a measurable benefit on BAIEC – at least not yet. BAIEC faces suit for the amount of money Escalade paid directly to Lai Yuan in China, so may ultimately have to pay Lai Yuan itself for this amount.

Additionally, even if Escalade had conferred a measurable benefit on BAIEC by paying Lai Yuan directly, there is no evidence that BAIEC impliedly requested Escalade to do so. Indeed, the most recent normal practice between the parties was that Escalade would pay BAIEC approximately seven days after shipment of goods from port, and BAIEC would then pay Lai Yuan within thirty days of the shipment. [Filing No. 72-2 at 5.] In other words, BAIEC would pay Lai Yuan after receiving payment from Escalade. The debt at issue in Escalade's unjust enrichment counterclaim – $636,926.75 – had not yet been paid by Escalade to BAIEC, so BAIEC could not pay Lai Yuan according to its usual practice. The Court rejects the notion that BAIEC somehow impliedly requested that Escalade pay Lai Yuan this amount directly, as it is starkly contradicted by the evidence. Rather than wanting Escalade to pay Lai Yuan directly, BAIEC repeatedly requested that Escalade pay it as was the parties' custom, and even noted that because Escalade was not paying BAIEC, it was impossible for BAIEC to pay the factories. [Filing No. 71-9 at 5.] This hardly indicates an implied request that Escalade pay Lai Yuan directly. Additionally, the evidence indicates that Escalade had determined it would pay Lai Yuan directly for outstanding POCs as part of its exit plan back in December 2012, before BAIEC even knew that Escalade was concerned or wanted to take its business directly to Lai Yuan. [*See* Filing No. 75-1 at 1-2 (December 15, 2012 email from Mr. Allshouse to Mr. Chung, advising him that he needed pricing information from Lai Yuan and "worst case, we'll tell John that we'll pay for all POs that have shipped, but we are paying the factory direct and then paying you. The balance of the POs will be cancelled for BAIEC and reissued directly to the factory").] This timing suggests that Escalade's direct payment to Lai Yuan was a decision made solely by Escalade and not requested by BAIEC.

Escalade's unjust enrichment counterclaim fails as a matter of law because Escalade has not conferred a benefit on BAIEC and, even if it had, BAIEC did not impliedly request that Escalade pay Lai Yuan directly.

2.     *Common Law Indemnity*[5]

In connection with its common law indemnity counterclaim, Escalade alleges that it was the "ultimate recipient of the goods produced by Lai Yuan," so was obligated to pay Lai Yuan for the goods ordered by BAIEC on Escalade's behalf, but alleges that its obligation to pay Lai Yuan was "wholly derivative of BAIEC's conduct." [Filing No. 19 at 14-15.] Therefore, Escalade argues, BAIEC is obligated to indemnify it for the amounts it paid directly to Lai Yuan. [Filing No. 19 at 15.] BAIEC argues that it is entitled to judgment as a matter of law on the indemnity counterclaim because it had no express contractual obligation to indemnify Escalade for payments to Lai Yuan, nor did it have a statutory obligation to do so. [Filing No. 69 at 34.] BAIEC also argues that Escalade is not entitled to common law indemnity because it was not derivatively liable for BAIEC since the parties did not have a retailer-manufacturer relationship and the doctrine of *respondeat superior* does not apply. [Filing No. 69 at 34.] Additionally, BAIEC contends that Escalade is not constructively liable for BAIEC, so indemnity is not warranted. [Filing No. 69 at 35.] In response, Escalade cites Indiana case law that it contends support the proposition that a principal is derivatively liable for its agent's debt, so common law indemnity applies. [Filing No. 86 at 34-35.] On reply, BAIEC disputes that Indiana law recognizes common law indemnity in the principal/agent context, but argues that even if it did, BAIEC was not Escalade's agent. [Filing No. 91 at 15-16.] BAIEC also argues that the Kelley Report is inadmissible under Fed. R. Ev.

---

[5] Escalade withdrew its second counterclaim – based on promissory estoppel – in a footnote in its response brief. [Filing No. 86 at 33.] Accordingly, the Court dismisses that counterclaim with prejudice.

702, and because it contains conclusory opinions. [Filing No. 91 at 19-20.] Escalade filed a sur-reply, defending the Kelley Report. [Filing No. 97.] It argues that the opinions in the Kelley Report relate to the customs and practices of Chinese supply chain management, that these opinions are factual and not legal, that the opinions are not readily subject to testing, and that summary judgment is not the proper time to evaluate the admissibility of Mr. Kelley's testimony. [Filing No. 97.]

Under Indiana law, a common law right to indemnity may be implied "only in favor of one whose liability to another is solely derivative or constructive and only against one whose wrongful act has caused such liability to be imposed." *Indianapolis-Marion County Pub. Library v. Charlier Clark & Linard, PC*, 929 N.E.2d 838, 848 (Ind. Ct. App. 2010), *trans. denied*, 940 N.E.2d 831 (Ind. 2010). "[D]erivative liability arises pursuant to either an employer/employee relationship (respondeat superior) or a manufacturer/seller relationship." *Id.* at 849 n.10 (citing *McClish v. Niagara Mach. & Tool Works*, 266 F.Supp. 987, 989-90 (S.D. Ind. 1967)). "Constructive liability arises when a statute or rule of law imposes a nondelegable duty on a party, rendering [it] liable when [it] is otherwise without fault." *Indianapolis-Marion County Public Library*, 929 NE.2d at 849 n.10; *see also* *Chubb Group of Ins. Cos. v. Buddy Gregg Motor Homes, Inc.*, 2001 WL 388858 (S.D. Ind. 2001) ("[C]onstructive liability may occur only when a statute or rule triggers a party's liability solely by the independent wrongful acts of another party") (collecting Indiana cases).

Escalade argues only that it is entitled to common law indemnity by virtue of its alleged principal/agent relationship with BAIEC. [Filing No. 86 at 33-35.] Escalade's argument fails because, even assuming a principal/agent relationship is enough to create a right to common law indemnity under Indiana law, the Court cannot find as a matter of law that BAIEC was acting as Escalade's agent.

Again, for the reasons discussed above, the Court will not rely upon the Kelley Report for the proposition that BAIEC was Escalade's agent. Escalade notes that "nowhere in Mr. Kelley's expert report does he ever opine that BAIEC was Escalade's agent pursuant to Indiana law or otherwise address the law of agency." [Filing No. 97 at 6.] But the Kelly Report does presume that this agency relationship existed, noting for example that "John Wei operates as an agent with management techniques from the 1980's-1990's," that "[t]he agent's role is to make timely payments to the supply chain to ensure that cash flows are adequate to enable an ongoing supply of parts to meet the order requirements," and that "[a]gent personnel should have clearly defined roles which are communicated to the foreign buyer and to the supply chain [and] [i]t is my opinion that BAIEC and John Wei failed to meet this standard." [Filing No. 86-3 at 7.] The Kelley Report includes a section titled "Foreign Buyer's Actions if the Supply Chain Is Under Threat of Disruption," which provides a longer discussion of an agent's role in the supply chain. [Filing No. 86-3 at 7-9 (noting "[c]onsequently, the actions of Wei and BAIEC caused Escalade to believe that Wei and BAIEC were not fulfilling their role as agents").] Escalade's argument that the Kelley Report never opines that BAIEC or Mr. Wei were Escalade's agents is disingenuous –the Kelley Report is based on this very premise. And, as discussed above, this is a legal conclusion, which is impermissibly drawn by an expert witness.

Having found that Escalade cannot rely upon the Kelley Report to show that BAIEC was acting as its agent, the Court turns to Indiana law to determine whether this was, in fact, the case. Escalade, as the party asserting that a principal/agent relationship existed, has the burden of proving so. *Smith v. Brown*, 778 N.E.2d 490, 495 (Ind. Ct. App. 2002). The elements necessary to establish an actual agency relationship under Indiana law are described as follows:

'Agency is a relationship resulting from the manifestation of consent by one party to another that the latter will act as an agent for the former.' To establish an actual

agency relationship, three elements must be shown: (1) manifestation of consent by the principal, (2) acceptance of authority by the agent, and (3) control exerted by the principal over the agent. These elements may be proven by circumstantial evidence, and there is no requirement that the agent's authority to act be in writing. Whether an agency relationship exists is generally a question of fact, but if the evidence is undisputed, summary judgment may be appropriate.

*Demming v. Underwood*, 943 N.E.2d 878, 884 (Ind. Ct. App. 2011) (citations omitted).

Escalade has not addressed any of these factors, instead presuming that BAIEC was its agent and conclusorily stating that "BAIEC contracted with a manufacturer to provide goods on Escalade's behalf in exchange for payment" and "at Escalade's direction and with its approval, BAIEC trained Lai Yuan how to produce products for Escalade, oversaw quality control and assisted with product design – all on Escalade's behalf." [Filing No. 86 at 34.] But Escalade has not presented any evidence that BAIEC's contract with Lai Yuan was made on Escalade's behalf, rather than just on BAIEC's behalf so it could satisfy its own obligations to Escalade. Similarly, Escalade has not presented evidence that it somehow directed the training of employees at the Component Factories or Lai Yuan, rather than BAIEC conducting that training so it could fulfill its own duties to Escalade. Indeed, the evidence indicates a relationship more akin to a buyer (Escalade) and seller (BAIEC), not a principal and agent.

The undisputed facts do not indicate that Escalade and BAIEC had a principal/agent relationship. Because this is the sole basis Escalade relies upon in response to BAIEC's motion, the Court finds that Escalade cannot show it is entitled to indemnity as a matter of law and grants BAIEC's Motion for Summary Judgment on that counterclaim.

## IV.
### CONCLUSION

Genuine issues of fact remain regarding whether Escalade can avail itself of the protections of § 26-1-2-609 to excuse its breach of the outstanding POCs. Accordingly, the Court **DENIES**

- 43 -

BAIEC's Motion for Summary Judgment, [Filing No. 68], to the extent that BAIEC seeks summary judgment on its breach of contract claim. The Court also finds as a matter of law that the Vendor Partnership Guide did not excuse Escalade's breach of the outstanding POCs. Additionally, the Court **GRANTS** BAIEC's Motion for Summary Judgment, [Filing No. 68], to the extent that it finds that Escalade has abandoned its promissory estoppel counterclaim and that its unjust enrichment and common law indemnity counterclaims fail as a matter of law.

Partial judgment will not issue at this time, and BAIEC's breach of contract claim, along with its unjust enrichment and quantum meruit claims, will proceed to trial. The Court requests that the Magistrate Judge confer with the parties to address the expeditious resolution of BAIEC's claims. Additionally, in light of the Court's finding that Escalade breached the POCs, and that Escalade will have the burden at trial of proving that § 26-1-2-609 excuses that breach, the Court requests that the Magistrate Judge address the order of the parties' presentations at the bench trial set for August 18, 2015.

DATE:  May 12, 2015

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana